State v. Wagoner.

No. 27,063.

THE STATE OF KANSAS, *Appellee,* v. HARLON WAGONER, *Appellant.*

SYLLABUS BY THE COURT.

1. INTOXICATING LIQUORS—*Unlawful Possession—Associates in Transportation.* Associates in the transportation and disposition of intoxicating liquor may each be guilty of possession of the liquor.

2. SAME—*Unlawful Possession—Evidence.* The evidence considered, and *held* one of two associates in the transportation and disposition of intoxicating liquor was in possession of it.

Appeal from Finney district court; CHARLES E. VANCE, judge. Opinion filed June 11, 1927. Affirmed.

*F. Dumont Smith, Don Shaffer* and *Mabel Jones Shaffer,* all of Hutchinson, for the appellant.

*William A. Smith,* attorney-general, *Roland Boynton,* assistant attorney-general, *Ray H. Calihan,* assistant attorney-general, and *A. M. Fleming,* county attorney, for the appellee.

The opinion of the court was delivered by

BURCH, J.: Defendant was convicted of persistent violation of the liquor law on two counts, one for possession, and one for transportation of intoxicating liquor. Judgment was pronounced accordingly, and defendant appealed. In this court he contests conviction on the possession count only.

Defendant testified he lived on a farm east of Hutchinson. His father was dead, he lived with his mother, and he helped his brother operate the farm. On November 20, 1924, defendant went to Garden City with one Curly Higgins, in a Marmon roadster which defendant said belonged to Higgins. Defendant said he went to Garden City to see a man named Dunn, with a view of selling Dunn a Ford sedan. Whether defendant owned a Ford sedan which he might sell, how he happened to know of a prospective customer so far away, where Curly Higgins lived, how defendant happened to get acquainted with him, and how it happened that Curly Higgins should opportunely appear and furnish defendant transportation to Garden City, are matters upon which the evidence throws no light. Defendant and Higgins and the roadster were in Garden City for two or three days. While there defendant drove the roadster, left it in two garages

Intoxicating Liquors, 33 C. J. pp. 581 n. 26, 585 n. 9 new, 759 n. 98, 761 n. 53.

for overnight storage, paid storage charges, and purchased gasoline and oil for the car, circumstances indicating that he might have a greater interest in the car than that of guest of Higgins. While the conduct of defendant and Higgins and the roadster in Garden City was such that it fell under observation of the city marshal and the sheriff, the jury apparently never did find out whether defendant accomplished the purpose of his trip and sold that Ford sedan to Dunn.

On November 24, Higgins had some unmentioned business in Dodge City, and defendant went with him. Who drove the Marmon roadster was not disclosed. Although defendant was not with Higgins all the time they were in Dodge City, they stayed at the same place at night. The next day Higgins had to return to the vicinity of Garden City. Defendant said he wanted to see some land there, and make a report on the crop situation. To whom the report was to be made does not appear, and it is greatly to be feared that, through interference of the pestering sheriff of Finney·county and the marshal of Garden City, information regarding the November, 1924, crop situation somewhere about Garden City never did reach whoever needed it.

Defendant went back with Higgins to the vicinity of Garden City. At the crossing of two highways some fourteen miles east of Garden City, the car was stopped. According to defendant, the late November weather was hot, the water in the radiator was boiling, and a dashboard wire was grounded. Apparently, the land to be inspected had not been reached, and the crop situation awaited observation. While the Marmon roadster was standing still, headed toward the north, with defendant at the wheel, the sheriff and city marshal came up on the crossroad in a Ford sedan. The sheriff tried to stop the sedan directly in front of the roadster, but the sedan skidded and went slightly beyond the roadster. Defendant quickly backed the roadster, then went forward, made a left turn, and drove rapidly westward toward Garden City. In making the left turn, the roadster struck the right rear fender of the sedan. The testimony for the state was, the roadster was in motion westward before the sheriff and the city marshal, who was also deputy sheriff, could alight from their car. As the roadster moved away, the deputy got out of the sedan, called to the occupants of the roadster, and shot twice at the roadster.

Defendant testified that when the Ford sedan came up and stopped in front of the roadster, he did not know who the occupants of the sedan were, and one of the men alighted and was "reaching for a gun." Defendant's counsel suggest that, so far as defendant knew, the men might have been "high-jackers." Defendant did not give the jury this explanation of his great haste to get away when the sedan was suddenly planted in front of the roadster. It so happened there were fifteen gallon cans of alcohol in the roadster. This was not defendant's first experience with a sheriff looking for liquor. The sheriff of Reno county had searched the farm on which defendant resided, and had found liquor in defendant's room, and the jury were authorized to believe that fear of arrest accounted for the dexterous celerity with which defendant operated the Marmon roadster when the officers arrived.

Defendant testified that, after he "speeded up the roadster" and drove by the sedan, Higgins said there was a quantity of liquor in the roadster, and to "step on it"; and that defendant did not know there was liquor in the car until Higgins spoke.

Whether in obedience to Higgins' suggestion or from some other motive, defendant did "step on it," and the sheriff's pursuing Ford was outstripped. Leaving the paved highway, defendant drove northward, and went around to a place where there was a crop situation. Shocks of cane stood in a cane field. Defendant testified Higgins was crippled with rheumatism, and at Higgins' request, defendant removed the liquor to a cane shock. He said he did nothing but pick up the cans, take them to the cane field, and throw them down. Before this service for Higgins was completed, that Javert of a sheriff and his deputy appeared at the top of the hill. They testified they saw defendant going toward a cane shock with three or four cans in his arms. He threw these cans down at the shock, or put them in the shock, and returned to the roadster. When he reached the roadster, Higgins had already put it in motion. Defendant stumbled and fell on the running board, but finally got into the car, and Higgins drove it away. The sheriff and his deputy went to the cane shock, found the fifteen cans of alcohol, and took possession of them. The sequel to this story will be found in the opinion in the case of *State v. Wagoner* (ante, p. 586).

Before the trial, Higgins was convicted of having liquor in his possession and of transporting liquor, and defendant introduced in evi-

dence the verdict in the Higgins case. The court gave the jury an instruction on the subject of possession, which is not complained of, with this exception: The jury were advised that it was not necessary the control or dominion over the liquor essential to possession by defendant, should be exclusive.

In the case of *State v. Metz,* 107 Kan. 593, 193 Pac. 177, the subject of possession was discussed as follows:

"It is sufficient to say that we are concerned with corporeal possession in fact. . . . Corporeal possession is the continuing exercise of a claim to the exclusive use of a material thing. The elements of this possession are, first, the mental attitude of the claimant, the intent to possess, to appropriate to oneself; and second, the effective realization of this attitude. Effective realization involves the relation of the claimant to other persons, amounting to a security for their noninterference, and the relation of the claimant to the material thing itself, amounting to a security for exclusive use at will. All the authorities agree that an intent to exclude others must coexist with the external facts, and must be fulfilled in the external physical facts, in order to constitute possession." (p. 596.)

The references to exclusion of others were not intended to limit possession to a single person. There may be joint possession by associates, and one person may act in conjunction with another in a relation or under circumstances which make him a copossessor, or participant in possession, as against the rest of the world. The jury were instructed with reference to this form or aspect of possession.

Defendant contends that, under authority of the Metz case and the case of *State v. Munson,* 111 Kan. 318, 206 Pac. 749, he did not have corporeal possession in fact of the fifteen cans of alcohol. To sustain the contention, it is necessary to accept as true testimony which the jury were privileged to discredit, and which for the purpose of this appeal may be disregarded. This testimony includes defendant's testimony relating to purpose of the journeys to Garden City and to Dodge City, and purpose of the return from Dodge City to the vicinity of Garden City; defendant's account of the meeting of the two automobiles at the crossroads; his testimony relating to the time when he first learned there was liquor in the car; and his testimony relating to how he happened to handle the liquor at the cane field.

From the credible evidence the jury were authorized to believe that defendant and Higgins left Hutchinson for Garden City with a

stock of liquor, on a liquor venture in which defendant was interested, and under the decision in the Metz case, defendant clearly had possession of the liquor while at Garden City. He used the car with the liquor in it as if it were his own, and there was no evidence the car was not his except his own statement that Higgins owned it. He was in control of the car with the liquor in it at the crossroads, and avoided arrest on his own initiative before Higgins said anything. The association of defendant with Higgins and the liquor and the roadster was so intimate, and extended over so much time and territory, that the jury were authorized to infer defendant was hiding the liquor in the cane shock with the expectation of returning for it in the interest of both himself and Higgins.

The judgment of the district court is affirmed.

HUTCHISON, J., not sitting.